Filed 1/26/24 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIRST APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re TONY R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TONY R.,<br><br>    Defendant and Appellant. | A166850<br>(Solano County<br>Super. Ct. No. J45405)<br><br>**ORDER MODIFYING OPINION AND DENYING REQUEST FOR REHEARING**<br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

The opinion filed on December 28, 2023, is modified as follows:

On page 10, footnote 7, second paragraph, add new penultimate sentence (before "The court granted the six-month reduction.") as follows:

The report noted that Tony had "not been subject to any incidents during his commitment to RISE," which was "commendable considering he ha[d] been in the program for approximately a year and a half"; it did not explain the inconsistency between this report of no incidents and earlier probation reports mentioning two fights early in the commitment.

1

The petition for rehearing is denied.

There is no change in judgment.

Dated:_____                    _____
                                   STEWART, P.J.

Trial Court:Solano County Superior Court

Trial Judge:          Hon. David E. Power

Counsel:

Amanda K. Roze, under appointment by the Court of Appeal, for Defendant
and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney
General, Jeffrey M. Laurence, Assistant Attorney General, Seth K. Schalit,
Lisa Ashley Ott, Deputy Attorneys General, for Plaintiff and Respondent.

Filed 12/28/23 (unmodified version)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA


FIRST APPELLATE DISTRICT


DIVISION TWO



| | |
|---|---|
| In re TONY R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. TONY R., Defendant and Appellant. | A166850 (Solano County Super. Ct. No. J45405) |


Under legislation governing the commitment of juvenile offenders to county level "secure youth treatment facilities," the juvenile court must review each case at least every six months and, at each six-month review hearing, has authority to reduce by up to six months the baseline term of confinement initially set at disposition. Tony R. appeals from the juvenile court's denial of his request for a reduction of his baseline term of confinement at his first six-month review hearing. He contends the court

1

lacked authority to deny the request and, to the extent it had such authority, abused its discretion.  We affirm.

**BACKGROUND**

**I.**

*Factual Background*

**A. The El Sobrante Offenses[1]**

As Paraminder Soomal (age 59) and his father, Swarn Singh (age 84), were mowing the lawn at their home in El Sobrante on the evening of October 3, 2021, a BMW pulled up and three Black youths got out, all brandishing handguns, and begin beating Soomal and Singh.  On video from the home's Ring camera, a voice can be heard saying " 'Hey everybody, give me your shit n---a.' "  Singh backs up as Tony[2] shouts, " 'take that watch off n---a, shut the fuck up and take that watch off n---a,' " and Singh falls backwards onto the porch.  Tony appears to "forcefully take property off" Singh, who attempts to defend himself while lying on his back and swinging an electrical cord at Tony.  During this struggle, Tony points the gun at Singh, throws a chair at Singh's head, and strikes Singh several times with the handgun.  Soomal then strikes Tony's head with an empty plastic bucket and Tony falls to the ground briefly.  Tony stands up and fires a round at Soomal, who falls and appears to lose all bodily function.  Suspect 2 fires several rounds.  The video shows only suspect 3's pants and shoes.  When the police arrived at about 6:25 p.m., they found Soomal lying on his back,

---

[1]  The facts pertaining to this incident are taken from the initial Solano County probation officer's disposition report, which in turn takes them from the Contra Costa Sheriff's report.

[2]  The probation report does not refer to Tony by name but rather to "Suspect #1."  The record indicates that "Suspect #1" is Tony and both parties' briefs refer to him where the probation report refers to Suspect #1.

2

bleeding from several gunshot wounds to his upper body.  Singh was sitting on the stairs bleeding from a gunshot wound to his head, with a witness providing aid.

Singh's skull was fractured from a gunshot wound just above his left eyebrow.  Interviewed at the hospital with the assistance of a Punjabi translator, Singh said that when the youths confronted them, he could not understand what they wanted because he speaks only Punjabi.  He did not know the youths and had never seen them before.  Soomal was paralyzed from the waist down and suffered severe internal bleeding due to a gunshot wound to his chest that exited his back and also had gunshot wounds to his right biceps and hip.  Soomal remained in the hospital until December 2.  On December 7, he told the police he would be in a wheelchair for the rest of his life and continued to have nightmares about the incident.  He was confused about why he and his father were attacked and said that if Singh had understood what they youths wanted, he would have complied.  He said Singh was suffering from nerve damage and memory loss.

Subsequent police investigation determined that then 14-year-old Tony was one of the three youths involved in the incident and he was arrested on November 18, 2021.  The other two youths involved were 16-year-old A.E. and 15-year-old C.E.

### B. The Alleged Solano County Offenses[3]

On September 27, 2021, police officers responded to Vallejo High School regarding an assault involving a firearm.  The vice principal told the officers that a parent had informed her on September 22, 2021, that her son W.B.

---

[3] The facts relating to this offense are taken from the amended disposition report filed on April 5, 2022, which takes them from a Vallejo Police Department report.

was assaulted and pistol whipped on September 20, 2021, during school hours, at First Presbyterian Church. W.B. told the vice principal he was lured to the church by his childhood friend G.H. Once there, they were contacted by A.E. (the 16 year old involved in the El Sobrante offenses), R.L, C.L. and Tony. At the direction of A.E., Tony held a gun to W.B.'s head while C.L. searched his person and backpack. During the incident, W.B. was pistol whipped in the head and suffered an unknown injury; a photo of the injury was requested but not received. School attendance records confirmed that W.B., Tony, G.H., C.L. and R.L were absent at the time of the incident. The vice principal called the police after the mother contacted her about threats to W.B. on social media by the suspects. The officers noted that screenshots from Instagram stories containing intimidating language that W.B. and his mother believed were threats against him did not clearly state specific threats of bodily harm and used "heavy slang terms and grammar." The vice principal later told officers she had received information from an anonymous student that a person believed to be Tony was seen armed with a gun on school property.[4]

## II.

### *Legal Proceedings*

#### A. Initial proceedings

As described in our opinion on Tony's appeal from the April 5, 2022 disposition order (*In re T.R.,* A165072), Welfare and Institutions Code[5]

---

[4] The probation report further stated that the vice principal "also noted, [the anonymous student] has observed [Tony] wearing a 'messenger bag/cross body shoulder bag' with one hand inside his pocket. She implied as if he was holding onto the grip of a gun."

[5] Further statutory references will be to the Welfare and Institutions Code except as otherwise specified.

section 602 petitions were filed in Contra Costa County and Solano County. In the Contra Costa case, Tony pleaded no contest to one count of attempted murder (Pen. Code, §§ 664/187, subd. (a)) and one count of second degree robbery (*id.*, §§ 211/212.5, subd. (c)) and admitted enhancements for personal use of a firearm (*id.*, § 12022.5, subd. (a)), infliction of great bodily injury causing coma and paralysis (*id.*, § 12022.7, subd. (b)) and infliction of great bodily injury on an elderly victim (*id.*, § 12022.7, subd. (c)).

The case was transferred to Solano County, Tony's county of residence, and the Solano County petition was dismissed pursuant to the parties' agreement that the court could consider the underlying facts in ordering restitution and considering the appropriate disposition in the Contra Costa case. After a contested disposition hearing, Tony was committed to the Reaching Into Successful Endeavors (RISE) program for a maximum term of 11 years or until age 25, with a baseline term of four years. We affirmed this disposition order. (*In re T.R.,* A165072.)

**B. Proceedings Underlying the Present Appeal**

As required by section 875, the probation department's report for the 30-day review hearing included an "Individualized Rehabilitation Plan" indicating "targeted areas of need" and programs and treatment Tony was participating in and was expected to participate in as he moved through the program. Tony had expressed interest in strengthening his communication skills and appeared happy to know there would be services aimed at this goal. A "Youth Level of Service/Case Management Inventory (YLS/CMI)" completed on December 8, 2021, assessed he was at high risk to reoffend in the community, had "high need" in the areas of "Education/Employment, Peer Relations, and Leisure/Recreation" and was "moderate risk" in the areas

5

of "Family Circumstances/Parenting, Substance Abuse, Personality/Behavior, and Attitudes/Orientation."

The probation report related that Tony was working on the "Responsivity Carey Guide,"[6] which was intended to tailor services to a youth's "preferred methods of communication and understanding of material." Prior to his arrest, Tony had not earned any high school credits due to unexcused absences and suspensions, but his current school grades were one A, one B and two Cs (3.5 credits) and he reportedly worked well in groups and communicated well with his teacher and peers. He was receptive to services and staff, believed the program could be beneficial for him and intended to "absorb the skills and knowledge being provided to him and seek an early exit from the program."

At the May 5 hearing, the court commented that it appeared Tony's needs were being addressed and he was doing well academically. Defense counsel, who had argued against commitment to RISE at disposition in part because the program, in her view, was not yet operational, told the court that the services Tony was receiving were the same as they had been before his commitment to RISE.

For the six-month review hearing on September 20, 2022, the probation officer reported that Tony was performing well and maintaining consistent progress. He had undergone assessments for needs related to delinquency, mental health and substance use, which identified needs in the areas of mental health, anger management, education support, substance abuse, individual counseling, employment skills, cognitive behavioral treatment and

---

[6] The probation report described Carey Guides as "individual cognitive behavioral worksheets which can be used as intervention tools and practice of cognitive processing skills."

independent living skills.  Tony had acknowledged a need to address his ability to make rational decisions and the impact family dynamics had on his mental health and behavior, expressed a goal of attaining "self-sufficiency through education and employment" and was continuing to engage in treatment and interventions.

Tony had "completed tools 1-3 of the Anger Carey Guide," earned certificates for completing "Aggression Replacement Training" (a 30-session cognitive behavioral group), the "Rythmic [*sic*] Mind Program," the "Hidden Genius Grab Opportunities and Level Up" program, the eFoodHandler Basic Safety Course," and the "Work-Ready Certification Program."  He was continuing to work individually and in group settings to complete Carey Guides, had begun working on "Courage to Change Interactive Journals," was engaged with the Omega Men's Group (a "culturally responsive mentoring group facilitated by Vallejo Unified School District"), was meeting regularly with his assigned mentor, and was participating in weekly "Restorative Justice" groups and "Leaders in Community Alternatives Transitional Case Manager."  His therapist reported that he attended every appointment, engaged actively and was " 'progressing successfully toward treatment goals established post-assessment.' "  Tony's most recent grades in school were all As and Bs (3.76 GPA) and he had completed "71 credits of 71 credits attempted," was on track to graduate high school with his class in 2025 "if not earlier" and was interested in pursuing a college education.

Tony's re-entry plan was for him to return to the home of S.D., with whom he had lived prior to his arrest.  Tony had expressed concern over his support system and the probation department intended to work with his family to identify other "pro-social" adults in his life and increase Tony's contact with them.

The probation report stated that as of September 20, when the report was filed, Tony was "interacting pro-socially with staff and peers and has not been subject [to] a major rule violation." It was noted that he had been in two fights with other youth since being committed to RISE, one in late April 2022, a few weeks after the commitment to RISE, and the other in July 2022, on which occasion he was reported to be the victim. No details regarding either incident were discussed. The department recommended that the wardship be continued "with all prior orders to remain in effect."

At the six-month review hearing on September 20, defense counsel asked Judge Stashyn, the judge who had presided over the disposition hearing, to consider reducing Tony's baseline term as authorized by section 875. The People opposed the request and the court directed Tony's attorney to file a written request to which the People could reply. Declining to rule on the oral motion, the court explained that it remembered the case well, including the "emotional input from both sides," it was "not an easy case for the Court either" and it would not "do anything on the fly."

On October 19, 2022, Tony filed a motion to reduce his baseline commitment by six months (§ 875, subd. (e)(1)) due to his consistent positive performance. In opposition, the People argued there had not been sufficient time and progress to justify a reduction.

The October 26, 2022 hearing on Tony's motion was before a different judicial officer, Judge Power. The court had reviewed the parties' briefs and probation reports for the disposition hearing, the May 5 30-day review and the current defense request and People's response; it reviewed the September 20 probation report at the outset of the hearing. Defense counsel pointed out that the form used for the six-month review did not include a section for the probation department to state a recommendation as to

8

whether the baseline term should be reduced and suggested asking the probation officer, who was present, if he had an opinion. Defense counsel argued that Tony was doing everything he should and could be doing, with "not one blemish," and that the incentive to have time reduced was "very precious" to young people. Counsel pointed out that everyone in RISE was "starting off with a bad case, a bad fact pattern, a bad incident" and argued that while section 875 does not provide guidelines for how to measure success, Tony was on track, getting good grades, behaving well and engaged in his plan, and should be given the reduction as incentive to continue doing well. The People argued that the "measure of success" was how much time it would take to rehabilitate the minor and that there had not been sufficient time and progress to justify a reduction in the time the probation department would have to work with Tony toward rehabilitation and ensure the community would be safe when he left the program.

The court denied the motion to reduce the baseline term. The court commended Tony for his efforts and acknowledged he was "working a good program," but noted that his "rehabilitation needs are significant" and "the individualized services are just getting started in the Court's view." The court stated, "[a]lthough the minor is participating and engaging in [the] program, not enough time has passed by to say that the risks have diminished. · He is working and he is doing well in the RISE program. · The Court takes note of it, but probation did not recommend a reduction. · The Court does not find good cause for a reduction, given the totality of the circumstances in the reports the Court has reviewed."

Tony filed a timely notice of appeal on December 13, 2022.[7]

## DISCUSSION

### *The Juvenile Court Did Not Abuse Its Discretion.*

Tony argues that a minor who performs well during the six-month review period is entitled to a reduction in the baseline term and denial of such a reduction thwarts legislative intent and impedes rehabilitation. He further contends that the judge who denied his request lacked authority to do so because the denial amounted to an improper reconsideration and increase of the baseline term set by a different judge at disposition. To the extent the

---

[7] During the pendency of this appeal, the second six-month review hearing took place in March 2023. The probation report detailed Tony's continued engagement in his program, excellent academic performance (4.0 GPA for the last quarter, on track to graduate high school a year early) and overall good behavior. Considering Tony's "progress relative to his rehabilitation plan" and "demonstrated application of skills being learned as indicated by his positive behavior" but also the nature of his offenses and "grave risk to the community," the probation department recommended a four-month reduction in the baseline term. The court granted the four-month reduction.

For the next six-month review in September 2023, the probation department recommended a six-month reduction in the baseline term. Tony was continuing to successfully engage in and complete programs, had earned all As for the last five grading periods and was also enrolled in an online community college class in which he had a B grade, was engaged in individual therapy and vocational training, was distancing himself from his co-responsible, who was also committed to RISE, was described by staff as a role model for his peers, and had become a peer mentor. The court granted the six-month reduction.

court had discretion to deny the reduction, Tony maintains, it abused its discretion by relying on inappropriate considerations.

## I.

### *Governing Law and Principles*

Section 875, which governs the commitment of juvenile wards to the secure youth treatment facilities that have replaced the Division of Juvenile Justice (DJJ) as the most restrictive placement alternative, was enacted in 2021 (Stats. 2021, ch. 18, § 12) as part of the juvenile justice realignment process begun the year before.  (Stats. 2020, ch. 337; § 736.5; *In re Miguel C.* (2021) 69 Cal.App.5th 899, 907.)  "The expansive [realignment] legislation draws from evidence that 'justice system-involved youth are more successful when they remain connected to their families and communities,' have lower recidivism rates, and are better prepared to transition back into their communities."  (*In re Miguel C.,* at p. 907, quoting Stats. 2020, ch. 337, § 1.)  In the realignment bill, the Legislature stated its intent "for counties to use evidence-based and promising practices and programs that improve the outcomes of youth and public safety, reduce the transfer of youth into the adult criminal justice system, ensure that dispositions are in the least restrictive appropriate environment, reduce and then eliminate racial and ethnic disparities, and reduce the use of confinement in the juvenile justice system by utilizing community-based responses and interventions." (Stats. 2020, ch. 337, § 1, subd. (e).)

Section 875 requires the juvenile court, in committing a ward to a secure youth treatment facility, to set a "baseline term of confinement" that "shall represent the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge to a period of probation supervision in the community."  (§ 875, subd. (b)(1).)  The

11

baseline term of confinement is based on the ward's "most serious recent" adjudicated offense. (*Ibid.*) Tony's baseline term is four years.[8]

Section 875 requires the development of an "individual rehabilitation plan" for the ward, which must identify the ward's needs and describe the programming, treatment and education to be provided in relation to the identified needs. (§ 875, subd. (d)(2).)[9] The court is required to review and approve the individual rehabilitation plan within 30 days of commitment. (*Id.*, subd. (d)(1).)

Section 875 provides for potential downward modification of the baseline term of confinement. The juvenile court is required to hold a progress hearing "not less frequently than once every six months." (§ 875,

---

[8] At the time of Tony's disposition hearing, juvenile courts were to set the baseline term "utilizing the discharge consideration date guidelines applied by the [DJJ] prior to its closure." (§ 875, subd. (b)(1).) The Judicial Council has since adopted a "matrix of offense-based classifications" which juvenile courts are now required to use instead of the DJJ guidelines. (§ 875, subds. (b)(1), (h); Cal. Rules of Court, rule 5.806.)

Further references to rules will be to the California Rules of Court.

[9] Specifically, section 875, subdivision (d)(2), requires that the individual rehabilitation plan "do all of the following:

"(A) Identify the ward's needs in relation to treatment, education, and development, including any special needs the ward may have in relation to health, mental or emotional health, disabilities, or gender-related or other special needs.

"(B) Describe the programming, treatment, and education to be provided to the ward in relation to the identified needs during the commitment period.

"(C) Reflect, and be consistent with, the principles of trauma-informed, evidence-based, and culturally responsive care.

"(D) The ward and their family shall be given the opportunity to provide input regarding the needs of the ward during the identification process stated in subparagraph (A), and the opinions of the ward and the ward's family shall be included in the rehabilitation plan report to the court."

subd. (e)(1).)  "In the review hearing, the court shall evaluate the ward's progress in relation to the rehabilitation plan and shall determine whether the baseline term of confinement is to be modified.  The court shall consider the recommendations of counsel, the probation department and any behavioral, educational, or other specialists having information relevant to the ward's progress.  At the conclusion of each review hearing, upon making a finding on the record, the court may order that the ward remain in custody for the remainder of the baseline term or may order that the ward's baseline term or previously modified baseline term be modified downward by a reduction of confinement time not to exceed six months for each review hearing. The court may additionally order that the ward be assigned to a less restrictive program, as provided in subdivision (f)."  (*Id.*, subd. (e)(1).)

A ward's confinement "shall not be extended beyond the baseline confinement term, or beyond a modified baseline term, for disciplinary infractions or other in-custody behaviors," which must be "addressed by alternative means."  (§ 875, subd. (e)(2).  At the conclusion of the baseline confinement term, the court must hold a probation discharge hearing at which it must "review the ward's progress toward meeting the goals of the individual rehabilitation plan" and must discharge the ward to probation supervision "unless the court finds that the ward constitutes a substantial risk of imminent harm to others in the community if released from custody," in which case the ward "may be retained in custody in a secure youth treatment facility for up to one additional year of confinement."  (§ 875, subd. (e)(3).)

13

## II.

### *Analysis*

### A. The Juvenile Court's Order Was Within Its Authority.

Tony's position on this appeal is based on the Legislature's stated intent, in juvenile justice realignment, to facilitate rehabilitation, treat youth offenders in the "least restrictive appropriate environment" and "reduce the use of confinement in the juvenile justice system by utilizing community-based responses and interventions." (Stats. 2020, ch. 337, § 1, subd. (e).)  He maintains that rehabilitation is facilitated by the use of incentives that encourage positive behavior and, therefore, in order to effectuate legislative intent, a six-month reduction in the baseline term "should be seen as the default position for all youth who are engaging in their programs as intended."  Tony argues that because there is undisputed evidence that he performed well during the first six-month review period, he was entitled to the six-month reduction he requested.

We agree that the record reflects Tony consistently engaged in and performed well in his treatment, services and programs.  The probation report was almost entirely positive, the only exception being a one-sentence reference to his having been in two fights since being committed to RISE (as the victim in the more recent one), which no one mentioned at the hearing. The juvenile court appropriately commended Tony on his performance. We cannot agree, however, that section 875 *entitles* a ward who performs well on his rehabilitation plan to a reduction in the baseline term.

### 1. *Section 875 Does Not Establish an Entitlement to Reductions in the Baseline Term of Confinement.*

The proper interpretation of a statute is a question of law that we review de novo.  (*In re R.D.* (2008) 163 Cal.App.4th 679, 686.)  "We begin with

the language of the statute as the most reliable indicator of legislative intent . . . ." (*People v. Holmes* (2004) 32 Cal.4th 432, 438.)

Section 875, subdivision (e)(1), provides that the juvenile court "shall" hold a review hearing at least every six months and, "[a]t the conclusion of each review hearing, upon making a finding on the record, the court *may* order that the ward remain in custody for the remainder of the baseline term or *may* order that the ward's baseline term or previously modified baseline term be modified downward by a reduction of confinement time not to exceed six months for each review hearing." (Italics added.) " ' " 'It is a well established rule of statutory construction that the word "shall" connotes mandatory action and "may" connotes discretionary action.' [Citations.]" ' [Citation.]" (*In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 348; *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 [" 'may' is ordinarily construed as permissive, whereas 'shall' is ordinarily construed as mandatory"].) The statutory language clearly gives the juvenile court discretion to reduce the baseline term but does not require it to do so.

Tony argues that section 875 should be interpreted as "providing an expectation" that substantial compliance with an individual rehabilitation plan will result in a six-month reduction of the baseline term and allowing juvenile courts a "limited type of discretion that should be exercised in favor of a reduction whenever possible." This argument is based on a number of policy considerations related to the Legislature's implicit recognition, in providing regular opportunities for reduction of a ward's confinement time, that incentives for positive behavior are an important rehabilitative tool. Rule 5.806, which addresses selection and modification of the baseline term, makes this point explicit: "To provide an incentive for each youth to engage productively with the individual rehabilitation plan approved by the court

15

under section 875[, subdivision] (b)(1), each probation department operating a secure youth treatment facility must implement a system to track the positive behavior of the youth in a regular and systematic way and report to the court at every progress hearing on the youth's positive behavior, including a recommendation to the court on any downward adjustment that should be made to the baseline term in recognition of the youth's positive behavior and development." (Rule 5.806(c).)[10]

Tony argues that the incentive for positive behavior will be lost if good performance is not rewarded with a reduction of the baseline term, and denial of a reduction when a ward has performed well make "could reasonably evoke mistrust in the system, and negatively impact a youth's future efforts." He maintains that if a reduction is not treated as the default where a ward has performed well, "wards who are making their best efforts may be treated the same as those who make no efforts." Additionally, he urges that his interpretation of section 875 is necessary to avoid the risk of varied and arbitrary results, within a case and between jurisdictions, such as

---

[10] The Advisory Committee Comment to rule 5.806 addresses the incentive structure in its comments on the matrix adopted to guide the initial selection of the baseline term: "A primary objective of a commitment to a secure youth treatment facility must be an evidence-based and trauma-responsive effort to promote healthy adolescent development. This objective will be achieved by providing positive incentives for prosocial behavior, focusing on the treatment needs of the youth to ensure healing and rehabilitation, and with a persistent focus on the end goal of successful reentry into the community. The flexibility inherent in the matrix is intended to result in a baseline term of commitment that is no longer than necessary to protect the public but is of sufficient length to assure the victim and the community that the harm committed can be redressed by the juvenile justice system in a developmentally appropriate manner and thus reduce the need for the youth to be transferred to criminal court."

good performance in one county leading to a six-month reduction while excellent performance in another county may result in no reduction. Using his own case as an example, he points out that he was denied any reduction at the first six-month review, then received a four-month reduction at the second review and a six-month reduction at the third.

Tony's arguments reflect valid concerns that should be among the constellation of factors a juvenile court considers in determining whether a ward's baseline term should be reduced and, if so, by how much. But they do not justify an interpretation of section 875 that departs from the plain language of the statute. They also assume too narrow a measure of a ward's progress.

Section 875 directs the court to decide whether to order a reduction after "evaluat[ing] the ward's progress in relation to the rehabilitation plan," including consideration of "the recommendations of counsel, the probation department and any behavioral, educational, or other specialists having information relevant to the ward's progress." (§ 875, subd. (e)(1)(A).) This directive implies a measure of progress more comprehensive than just whether the ward is behaving well and participating in the programming called for in the rehabilitation plan. Commitment to a secure youth treatment facility is reserved for wards who have committed the most serious offenses, for whom such commitment is necessary to achieve the goals of rehabilitation and community safety. (See § 875, subd. (a)(1), (a)(3)(D).) Compliance with the rehabilitation plan is undeniably laudable, but it is not necessarily in itself the full measure of how much progress a ward has made in terms of specific behavioral and psychological issues; whether the progress is sufficient to be confident that a reduced baseline term will leave sufficient time for rehabilitation and successful reentry will depend on the particular

17

ward and how far the ward has to go.  Thus, we cannot agree with Tony that a ward's good behavior and full participation in the rehabilitation plan *necessarily* requires a reduction without regard to other potentially relevant considerations, including how much the minor has progressed with respect to individual treatment needs and programming goals and how long a time period is expected to be necessary for the ward's full rehabilitation and protection of the public.

As we have said, section 875 uses discretionary language—the court "may" reduce the baseline term up to the limit of six months per review hearing—without indicating an intent to have juvenile courts exercise their discretion in a limited fashion.  "[T]he juvenile court has long enjoyed great discretion in the disposition of juvenile matters . . . ." (*In re Greg F.* (2012) 55 Cal.4th 393, 411.)  This discretion would be undermined by the "standardization" that Tony sees as necessary to avoid arbitrariness.

The Legislature could have worded section 875 to require a reduction of the baseline term in certain circumstances or absent others, for example, by providing that the court is to order a reduction when a ward has substantially complied with the individual rehabilitation plan, unless the court finds the reduction would jeopardize the ward's full rehabilitation or public safety.  It did not do so.  Instead, it authorized the juvenile court to order the reduction after evaluating the ward's progress.  The Legislature specified requirements that the baseline term of confinement "represent the time in custody necessary to meet the developmental and treatment needs of the ward and to prepare the ward for discharge to a period of probation supervision in the community" and be determined in accordance with specified guidelines based on the most serious offense (§ 875, subd. (b)(1)), and that the court determine whether to reduce the baseline term after

18

evaluating "the ward's progress in relation to the rehabilitation plan" and limit any reduction to six months per review period.  (§ 875, subd. (e)(1)(A).)  The Legislature specified no further constraints.  Accordingly, we read section 875 as entrusting juvenile courts to exercise their long-standing broad discretion over juvenile dispositions, consistent with the legislatively established parameters, in first setting a baseline term of confinement and subsequently determining whether a reduction in that term of confinement is warranted.

We are not persuaded to the contrary by Tony's argument that, in order to avoid arbitrary results, it is necessary to interpret section 875 as limiting juvenile courts' discretion and establishing an expectation that substantial compliance with the individual rehabilitation plan will result in a six-month reduction.  Tony sees the present case as demonstrating arbitrariness because he was denied a reduction at the first review hearing, granted a four-month reduction at the second review and granted a six-month reduction at the third.  The orders from the second and third review hearings, of course, are not before us on the present appeal.  But assuming, as appears from the limited information provided to us, that Tony continued to do well with his treatment and programming, we see nothing arbitrary in successive review hearings resulting in successively greater reductions in the baseline term.  To the contrary, this pattern suggests that Tony's continued positive performance over an increasing time period has increased the court's confidence that Tony is solidifying his rehabilitation.

As for potential arbitrariness in results across cases, we fail to see how the issue of baseline term reductions is any more prone to arbitrariness than other discretionary decisions with respect to juvenile dispositions.  As we have said, if the Legislature intended to limit juvenile courts' discretion

19

beyond the parameters stated in section 875, it could have done so.[11]  It is not for us to impose limits on the juvenile courts' discretion beyond those prescribed by the Legislature.

### 2. Denial of the Reduction Did Not Amount to "Overruling" the Baseline Term Set at Disposition.

Tony argues that Judge Power denied his request for reduction of the baseline term only because the judge and prosecutor believed insufficient time had passed, and that neither passage of time nor proper length of the baseline term were proper factors for the court to consider.  Emphasizing that section 875 calls the six-month review a "*progress review hearing,*" Tony argues its purpose is solely to evaluate the ward's progress.  In his view, by finding that insufficient time had passed and denying the requested six-month reduction, "Judge Power effectively reconsidered the baseline term set by Judge Stashyn" at the disposition hearing.  Relying on the rule that "one superior court judge may not overrule another" (*People v. Garcia* (2006) 147 Cal.App.4th 913, 916), Tony argues Judge Power exceeded his jurisdiction and denied him due process by "disagreeing" with Judge Stashyn and "refusing to grant an earned 6-month reduction."

We disagree.  Tony's position appears to be that Judge Stashyn set the baseline term at four years with the expectation that it would be reduced by six months at each six-month interval, provided Tony complied with his individual rehabilitation plan.  Denial of the six-month reduction, according

_____

[11]  In fact, a 2023 amendment to section 875 expressly acknowledged the juvenile court's discretion.  A new last sentence was added to section 875, subdivision (e)(1)(A), stating:  "The determination of whether the baseline term will be modified, or whether a youth will be assigned to a less restrictive program, is a judicial decision and the juvenile court's discretion may not be limited by stipulation of the parties at any time."  (Stats. 2023, ch. 47, § 30.)

to this view, had the effect of *extending* the baseline term set by Judge Stashyn. This argument is necessarily premised on acceptance of Tony's view that a six-month reduction is *required* as long as a ward complies with the case plan. We have rejected Tony's interpretation of section 875 as creating an entitlement to a six-month reduction as well as his view of the measure of progress requiring a reduction. Progress "in relation to the rehabilitation plan" (§ 875, subd. (e)(1)(A)), as earlier discussed, appropriately implies consideration of the objectives and goals of the plan as well as compliance with its elements.

Tony sees Judge Stashyn as having assured him that his baseline term would be reduced if he behaved well when she commented, at the 30-day review hearing, that "[w]hen [Tony] gets back to the community will, of course, depend on how he does. And he does have control of his own future." We cannot agree with Tony's characterization of Judge Stashyn's comments as promising a reduction. Defense counsel had been telling the court that the services Tony was receiving had not changed since the disposition hearing. Immediately before the quoted comment, counsel reminded the court that it had wanted counsel and the prosecutor to "look into the maximum time issue" and that they had agreed "the youth's base term is 4 years and his maximum is until 25." The court responded, "Okay. Well, certainly I hope that provides good motivation for your client. When he gets back to the community will, of course, depend on how he does. And he does have control of his own future. I hope he takes advantage of what is available to him. [¶] We will get another review date. It's unfortunate with the way the law is now. As we all observe, there is not much in between. Is there?"

In context, it is by no means clear the court was referring to reductions of the baseline term when it commented on Tony's control over when he

21

would be discharged; if anything, the court's remarks appear to have been directed at the difference between the baseline term and the maximum term. Even if construed as referring to the baseline, the court in no way specifically promised a six-month reduction. The court observed that the actual amount of time Tony would be confined would depend on "how he does" (i.e., his conduct, attitude and progress), consistent with the indefinite nature of a juvenile's actual term of confinement limited by the maximum term. There was no discussion of the potential for reduction in the baseline term, much less a specific promise.

Tony also relies on Judge Stashyn's remarks to argue that his position is supported by "[t]he principles underlying the policy of judicial estoppel," which " ' "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position. [Citations.] The doctrine's dual goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies. [Citation.]" ' " (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986.) Tony argues that after failing to object when Judge Stashyn told Tony "that his efforts in relation to his individual rehabilitation plan . . . would determine his release date," the People are now taking the opposite position by defending Judge Power's order. This argument, again reading Judge Stashyn's remarks as a specific promise regarding reduction of the baseline term, stretches Judge Stashyn's remarks beyond their reasonable meaning.

In short, we find no basis for viewing Judge Power's denial of Tony's request for a six-month reduction in the baseline term of confinement as overruling the baseline term set by Judge Stashyn.

**B. The Juvenile Court Did Not Abuse Its Discretion.**

The abuse of discretion standard of review "asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts." (*People v. Williams* (1998) 17 Cal.4th 148, 162.) We " ' "indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them." ' [Citation.]" (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1330.)

Here, the juvenile court was evaluating Tony's progress after the first six months of the four-year period determined at disposition to represent the time necessary to meet his developmental and treatment needs and prepare him for discharge. (§ 875.) Tony was by all accounts doing extremely well. But he had significant treatment and service needs, had committed extremely serious offenses with grave consequences for the victims and had been assessed as being at high risk for re-offense. It was within the court's discretion to determine that a reduction of his baseline term this early in his period of confinement would not serve his rehabilitative needs and public safety concerns.

Tony argues that a six-month reduction would have been consistent with the spirit of section 875, the court failed to appreciate that "the scope of its discretion was to evaluate the youth's progress in light of the legislative intent" and the court's reliance on insufficient time having passed was improper and lacked evidentiary support. These arguments are answered by our previous discussion: Section 875 does not create an entitlement based solely on a ward's good behavior and compliance with the rehabilitation plan, and both the time necessary to meet a ward's treatment needs and the time

23

thus far spent in confinement are relevant to evaluation of the ward's progress "in relation to the rehabilitation plan."

Tony suggests he was penalized for the probation department's failure to recommend a reduction. He argues that although section 875 requires the court to consider the probation department's recommendation (§ 875, subd. (e)(1)(A)) and the court "noted the absence of a recommendation from probation," the court did not ask the probation officer, who was present at the hearing, for his recommendation. Further, he maintains that if the probation department had executed its "duty" to include a recommendation as to reduction of the baseline term in its report, it would have been compelled to recommend a six-month reduction, and he should not be penalized for the department's failure to submit a recommendation.

The duty Tony refers to derives from rule 5.806(c), which now requires the probation department, in order "[t]o provide an incentive for each youth to engage productively with the individual rehabilitation plan approved by the court," to "implement a system to track the positive behavior of the youth in a regular and systematic way and report to the court at every progress hearing on the youth's positive behavior, *including a recommendation to the court on any downward adjustment that should be made to the baseline term in recognition of the youth's positive behavior and development*." (Italics added.) But this rule was not in effect at the time of the review hearing in October 2022: The rules pertaining to commitments to secure youth treatment facilities became effective on July 1, 2023. (Rules 5.804, 5.806, 5.807, 5.808.) Tony's characterization of the probation department as failing to comply with its duties is thus misplaced. More importantly, Tony's argument that his performance would have *required* the probation department to recommend a six-month reduction is unavailing for the

24

reasons we have already discussed:  Section 875 does not create an entitlement to reductions in the baseline term or preclude the court, or probation department, from considering the ward's progress on the individual rehabilitation plan in the context of the ward's treatment and service needs and public safety concerns.

The probation report submitted for this hearing did not say anything about a reduction in the baseline term; it simply recommended continuing the wardship and commitment with existing orders in effect, without a recommendation to grant or deny a reduction.  Nevertheless, the juvenile court was not wrong to state that "probation did not recommend a reduction." The report described Tony's considerable positive conduct and participation in programming but also noted significant needs and services and his assessment as high risk for re-offense.  Although rule 5.806 was not yet in effect and the probation department was not expressly required to include in its report a recommendation on modification of the baseline term due to a ward's positive behavior, section 875 directed the court to consider the department's recommendations in this regard.  (§ 875, subd. (e)(1)(A).)  The statute obviously contemplates that the probation department will make recommendations as to whether the baseline term should be modified, and there is no reason to think the probation department would not have included a recommendation in its report if it believed a reduction was appropriate.

Finally, Tony argues that he should not have to bear any consequences from the fact that RISE was not "fully operational" at the time he was committed to the program.  Noting that rule 5.807(c)(1)(A) requires the court to evaluate a youth's progress "in light of the programming made available to [him]," Tony urges us to disregard Judge Power's comment that "individualized services are just getting started in the Court's view."

25

We see nothing in the record to indicate that the denial of Tony's first request for a six-month reduction was due to lack of progress attributable to RISE not being fully operational when he was first committed. As discussed in our opinion on Tony's appeal from the disposition order committing him to RISE, Tony was being provided services and treatment, albeit not the more individualized ones RISE is designed to offer. Even at the May 5, 2022 hearing a month after disposition, the court noted that it appeared Tony's needs were being addressed and he was receiving appropriate intervention. In asking us to disregard Judge Power's comment that "individualized services are just getting started, in the Court's view," Tony appears to assume Judge Power denied his request for a reduction in the baseline term at least in part because the individualized services specific to the RISE program had only recently begun. We do not draw the same inference. Defense counsel had argued for a six-month reduction as incentive for Tony to continue the undisputedly good work he was doing on his case plan; the People argued there had been insufficient time and progress to justify shortening the time the probation department would have to work with Tony and ensure community safety when he was discharged. In context, we understand the court's comment as simply referring to Tony being at such an early phase of his rehabilitation program that it was too soon to conclude "the risks [had] diminished."

**DISPOSITION**

The order is affirmed.

26

_____
STEWART, P. J.

We concur.

_____
RICHMAN, J.

_____
MARKMAN, J. [*]

_In re Tony R._ (A166850)

_____

[*] Judge of the Alameda Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27

Trial Court:Solano County Superior Court

Trial Judge:        Hon. David E. Power

Counsel:

Amanda K. Roze, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Seth K. Schalit, Lisa Ashley Ott, Deputy Attorneys General, for Plaintiff and Respondent.